IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EUGENE QUICK, | ) | Case No. 3:18-cv-93 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| THE GEO GROUP, INC. and SHON | ) | |
| KUTA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I. Introduction

Eugene Quick, a correctional officer at Defendant GEO Group, Inc.'s ("GEO") Moshannon

Valley Correctional Center ("MVCC"), brought this Americans with Disabilities Act ("ADA") and

Pennsylvania Human Relations Act ("PHRA") suit against GEO, stemming from his termination

from MVCC in 2017. Quick alleges that GEO created a hostile work environment and wrongfully

terminated him as a result of a disability. GEO moved for summary judgment, arguing that Quick

was not disabled under the ADA, did not suffer an objectively hostile work environment, and

GEO terminated Quick for a failure to perform as expected. GEO's Motion for Summary

Judgment (ECF No. 26) is fully briefed (ECF Nos. 27–29, 37–42, 54, 58–59) and ripe for disposition.

This Court holds that GEO is not entitled to summary judgment because a reasonable jury

could conclude that GEO subjected Quick to a hostile work environment because of a perceived

disability and that GEO wrongfully terminated him for the same reason.

## II. Jurisdiction and Venue

This Court has jurisdiction over Quick's ADA claims because they arise under federal law.

28 U.S.C. § 1331. This Court has jurisdiction over Quick's state law claims because they form part

of the same case or controversy as his federal claims. 28 U.S.C. § 1367. Venue is proper because

Quick initially filed this action in the Court of Common Pleas of Clearfield County, which the

Western District of Pennsylvania embraces. 28 U.S.C. § 1441.

## III. Factual Background

The Court derives these facts from a combination of GEO's Concise Statement of Material

Facts (ECF No. 28), Quick's Responsive Concise Statement of Material Facts[1] (ECF No. 38), and

GEO's Amended Reply (ECF No. 58), as well as attached appendices (ECF Nos. 29, 39, 50, 59).

All facts recounted here are undisputed unless otherwise noted.

### A. Quick and Warden Kuta Begin Working for GEO at MVCC

GEO is a corporation that runs private prisons, one of which, MVCC, is located in

Philipsburg, Pennsylvania. (ECF No. 28 ¶ 1.) GEO initially hired Quick in September 2011 and

Quick quickly rose through MVCC's ranks; in September 2012, GEO promoted him to the

position of Correctional Officer. (Id. ¶¶ 2–3.) In June 2015, GEO promoted Quick to Lieutenant

at MVCC, and six months later, in December 2015, to the position of Training Administrator. (Id.

---

[1] Quick's Responsive Concise Statement of Material Facts contains some new material not included in a separate section of the document, and therefore does not completely comply with this Court's Practices and Procedures, or Local Civil Rule 56. *See Practices and Procedures of Judge Kim R. Gibson,* 27–28, https://www.pawd.uscourts.gov/sites/pawd/files/JG-Practices-Procedures.pdf; *Local Rules of Court,* United States District Court for the Western District of Pennsylvania, L. Civ. R. 56B.1, https://www.pawd.uscourts.gov/sites/pawd/files/lrmanual20181101.pdf. However, this failure to comply is minor as most of Quick's assertions have support in the record (*See, e.g.,* ECF No. 38 ¶ 7), and the Court will consider those facts in ruling on this Motion. However, the Court will disregard those which Quick has left unsupported. (*See, e.g.,* ECF No. 38 ¶ 83.)

¶¶ 5–6.) Prior to working for GEO, Quick served as a correctional officer for the Pennsylvania Department of Corrections as a Regional Inspection Captain and Major Chief of Security. (ECF No. 39-1 at 155:14–157:6.) Quick's duties as a Correctional Officer at MVCC included caring for, and maintaining control and custody of, inmates at MVCC. (ECF No. 28 ¶ 4.) Quick also served as an Emergency Preparedness Officer at MVCC, a job which involved inspecting and inventorying emergency equipment on at least a quarterly basis. (ECF No. 38 ¶ 31.) Shon Kuta ("Warden Kuta") began his tenure as MVCC's warden in October 2015. (ECF No. 39-2 at 11:20–12:8.) Warden Kuta was Quick's direct supervisor at MVCC. (ECF No. 39-1 at 58:3–6.)

Before Quick's promotion to Training Administrator, Quick served for two years as Alternate Training Administrator, spending about four months of the year working on training-related duties, rather than strictly those of a correctional officer. (ECF No. 38 ¶ 7.) This service as an Alternate Training Administrator involved a ten-month stint where Quick was effectively MVCC's full-time Training Administrator. (ECF No. 39-1 at 60:21–61:12.) During this stint, Quick received an award for his performance in that role and completed all necessary training for MVCC staff while also receiving "high marks" for three inspections in his role as a correctional officer. (*Id.* at 61:13–18.) There is no evidence that Quick's performance was anything less than satisfactory, or that GEO took any disciplinary action against him, prior to April 2016. Prior to becoming Training Administrator, Quick had met or seen Warden Kuta only twice. (ECF No. 39-1 at 57:2–58:19.) Warden Kuta made the decision to promote Quick to Training Administrator and Quick believes that Warden Kuta did so because he was impressed with Quick's performance prior to his promotion. (*Id.*)

According to the Training Administrator job description, Quick's duties included organizing all facets of MVCC's training programs for its staff, as well as occasionally developing curricula for those programs. (ECF No. 28 ¶ 8; ECF No. 29-1 at 103–05.) Quick was also responsible for administering training programs, documenting training hours of MVCC staff, reviewing training records, and verifying that MVCC employees were up to date with their training, as well as coordinating with MVCC staff to help them remain current in their training. (ECF No. 28 ¶¶ 9–10.) Quick's duties included overseeing, maintaining, and monitoring training records and the progress of MVCC staff in training, as well as performing other duties that GEO assigned Quick. (*Id.* ¶¶ 11–12.) Quick was also involved with oversight of new employee training and recommending to MVCC management which trainees were not up to standards, a position that required him to be inside MVCC's main facility, observing new employees. (ECF No. 39-1 at 146:16–22.) GEO states that the Training Administrator was also generally responsible for maintenance oversight of the training center, though Quick states that Warden Kuta specifically assigned him that duty in April 2016. (ECF No. 28 ¶ 13; ECF No. 38 ¶ 13.) The parties extensively dispute the exact extent of these oversight duties—GEO contends that it only expected Quick to contact the maintenance department to have issues fixed; Quick maintains that GEO effectively made him responsible for the entire upkeep of the training center, from personally cutting the grass to maintaining the wellness center. (ECF No. 28 ¶¶ 13–14; ECF No. 38 ¶¶ 13–14.) The parties also further dispute the extent of Quick's duties as Training Administrator, including whether Quick's duties included upkeep of MVCC's clothing issuance room. (ECF No. 28 ¶ 15; ECF No. 38 ¶ 15.)

-4-

With regard to the physical expectations for Quick's position, the job description indicates that the Training Administrator will have to occasionally (0-30% of the time) lift or carry items weighing between 11-60 pounds and occasionally pull weights of 41-60 pounds in carrying out the position's duties. (ECF No. 29-1 at 105; ECF No. 28 ¶ 16; ECF No. 38 ¶ 16.)

As Training Administrator, GEO required Quick to occasionally act as the prison's Staff Duty Officer ("SDO"), the Warden's administrative representative outside normal business hours. (ECF No. 28 ¶ 18.) This was a position that rotated on a regular basis between MVCC's senior staff. (*Id.*) The parties do not specify the extent of the SDO's duties, but those duties appear not to overlap with Quick's duties as Training Administrator. The parties dispute whether the SDO would have to continue to perform usual work duties, in addition to SDO tasks, during a stint as SDO, or whether Warden Kuta would excuse the SDO from usual work responsibilities during that period. (*Id.* ¶ 19; ECF No. 38 ¶ 19.) MVCC's senior staff also frequently worked in the prison's cafeteria, in MVCC's main facility, scanning inmate ID cards, a task most staff disliked, but that Quick "loved." (ECF No. 39-1 at 35:13–36:8.)

## B. Quick Suffers Medical Problems

In 2006, Quick suffered two heart attacks; arterial stents inserted around the time of the heart attacks, along with medication, stabilized his condition and he had no further serious cardiac issues until 2016. (ECF No. 28 ¶ 26; ECF No. 38 ¶ 26.) In March 2016, approximately two months after he officially began serving as Training Administrator, Quick visited a physician, Dr. Bhatnagar, in Altoona, Pennsylvania and Dr. Bhatnagar recommended that Quick undergo immediate open-heart surgery—quadruple bypass—which he did. (ECF No. 38 ¶ 27; ECF No. 29-1 at 6: 7–19.) Quick applied to GEO for medical leave at some point either before or after the

surgery, and GEO granted Quick medical leave from March 3, 2016, until April 25, 2016. (ECF No. 28 ¶¶ 27–28; ECF No. 38 ¶¶ 27–28.)

On April 1, 2016, Dr. Anastasi, a physician involved in treating Quick's heart condition, wrote GEO, stating that Quick could return to work on April 25, 2016, and work according to the duties GEO outlined in the Training Administrator job description—organizing training and occasional physical tasks like lifting and pulling. (ECF No. 38 ¶ 29.) Dr. Anastasi did not give Quick clearance to perform any and all work, such as manual labor or maintenance work, at MVCC. (*Id.*) On April 25, 2016, Quick resumed his duties as Training Administrator at MVCC. (*Id.* ¶ 30.) Shortly after Quick returned from medical leave, he had a meeting with Warden Kuta where Warden Kuta allegedly stated that Quick had returned from leave too early, that Warden Kuta believed that Quick should have taken at least a year to complete the healing process, and that Warden Kuta was placing Quick on "Dr. Kuta's restrictions." (*Id.* ¶ 31; ECF No. 28 ¶ 31.) These restrictions included limiting Quick to MVCC's training center, a separate building from MVCC's main facility. (ECF No. 39-1 at 34:16–35:3.) Several of Quick's duties required him to be in the main facility, including oversight of trainees, inventorying emergency equipment, and scanning inmate IDs in MVCC's cafeteria. (*Id.* at 35:4–36:8.) Quick asserts that these restrictions interfered with his ability to complete his duties as Training Administrator and a member of MVCC's staff. (ECF No. 38 ¶ 31.) The parties dispute whether GEO viewed Quick as unable to perform certain job functions and whether Warden Kuta restricted Quick's job duties based on that view. (*Id.* ¶ 31; ECF No. 28 ¶ 31.) Quick testified that Warden Kuta told him, after he returned from medical leave that MVCC's training center was now Quick's Kingdom, and he was responsible for "every aspect" of it: upkeep of the firing range and the building itself; the grass,

bushes, sidewalks, and weeds; and the training center's wellness facility. (ECF No. 39-1 at 36:11–25.)

On October 20, 2016, while performing maintenance at MVCC's training center, Quick suffered an injury to his left pectoral muscle; the parties dispute whether GEO required Quick to perform this task, or whether his only obligation with respect to maintenance tasks was to notify MVCC's maintenance department. (ECF No. 28 ¶¶ 32–34; ECF No. 38 ¶¶ 32–34.) Quick testified that he believed it was his obligation to ensure the maintenance was completed because MVCC's maintenance department was not completing the tasks and MVCC was issuing him reprimands for that failure, not the maintenance department. (ECF No. 39-1 at 101:2–102:20.) On October 31, 2016, Dr. Bhatnagar wrote to MVCC to inform Warden Kuta that Quick's injury was unrelated to his cardiac troubles and that he could return to work on that day; Dr. Bhatnagar's letter did not include any medical restrictions on Quick's duties. (ECF No. 28 ¶ 35.) Quick returned to MVCC on November 1, 2016, and he testified that, at that time, he did not believe that he needed an accommodation to perform his duties. (*Id.* ¶¶ 36–37.) The parties dispute whether anyone at MVCC, including Warden Kuta, viewed him as having limited capability to perform his duties as Training Administrator.[2]

## C. GEO Issues Quick Written Reprimands and Quick Allegedly Suffers a Hostile Work Environment

After returning from medical leave, Quick received a series of disciplinary actions from GEO and Warden Kuta on the basis that Quick was not performing to GEO's expectations and violating company policy. Quick's testified that, during the period after he returned from heart

---

[2] Quick asserts that "Dr. Kuta's" restrictions continued after he returned from his pectoral injury, limiting his duties and evidencing Warden Kuta's animus towards his condition. (ECF No. 38 ¶¶ 31, 38.)

surgery and was on "Dr. Kuta's" restrictions, it seemed like "every time I reported discrepancies to [Warden Kuta, he] turned around and wrote me up for it." (ECF No. 39-1 at 111:8–12.)

### 1. Quick Receives His First Reprimand for an Improper Inmate Count

On July 11, 2015, Quick conducted an inmate count[3] at MVCC and signed his name on the count sheet at 4:45 a.m. while the count sheet listed the time of the count as actually occurring at 5:00 a.m. (ECF No. 28 ¶¶ 39–40.) A monitor from the Bureau of Prisons ("the BOP Monitor") observed Quick incorrectly completing the count sheet and reported that Quick and several other correctional officers had violated BOP policies; the BOP sent then-Warden George Wigen a letter inquiring about the violations. (ECF No. 28 ¶ 41.) Quick claims that filling out the count sheets as he did was common practice at MVCC and that the BOP had asked MVCC to write the time of the actual count on the slip, rather than the time the correctional officers finalized the count sheet. (ECF No. 38 ¶ 41.) Warden Wigen referred the policy violations to GEO's Office of Professional Responsibility ("OPR") for an investigation. (ECF No. 28 ¶ 42.)

On April 29, 2016, less than a week after his return from his heart surgery, and almost a year after the July 11, 2015 violation, as a result of the OPR investigation, Quick and eleven other MVCC correctional officers received reprimands for the improper count sheet procedures. (ECF No. 28 ¶ 43; ECF No. 38 ¶ 31.) Quick was the only correctional officer to receive a written reprimand over the violation; the others violating the policy received verbal reprimands. (ECF No. 39-1 at 76:9–25.) Quick admits that he received the reprimand (the "April 29 Reprimand"), but asserts that GEO improperly issued it because: (1) OPR had closed the case, recommending

---

[3] During inmate counts, MVCC staff walk around the prison and count the inmates to ensure that none are missing. (ECF No. 38 ¶ 41A.)

no discipline against Quick; and (2) Warden Kuta became involved in the OPR process in contravention of GEO's internal policies and recommended Quick's discipline. (ECF No. 38 ¶ 43.) Quick received the April 29 Reprimand at the same meeting that Warden Kuta allegedly told Quick that he had come back from surgery too quickly and that Warden Kuta was placing Quick on "Dr. Kuta's" restrictions, limiting Quick to working only in MVCC's training center. (ECF No. 28 ¶ 44.)

Quick appealed the April 29 Reprimand, arguing that his actions were in conformity with MVCC's practices; Warden Kuta denied the appeal, stating that the fact that Quick's actions were common practice at MVCC did not make them acceptable. (*Id.* ¶ 45.) Warden Kuta also stated that Quick received a written reprimand rather than lesser discipline because Quick was the acting supervisor at the time of the violation. (*Id.*) Quick's appeal argued that other staff members at MVCC, including other supervisors, were engaged in the same practice and escaped discipline; in his decision, Warden Kuta did not respond to these allegations. (ECF No. 38 ¶ 45.)

## 2. Quick Receives a Second Reprimand for Failing to Properly Maintain MVCC's Training Center

On July 27, 2016, while giving another employee a tour of MVCC, Assistant Warden Eric Staiger ("AW Staiger"), noticed that MVCC's firing range appeared to be in a state of disrepair and that the training center's clothing issuance room was disorganized and lacked an accurate inventory. (ECF No. 28 ¶ 46.) When AW Staiger returned to the training center on August 3, 2016, these problems remained, and AW Staiger documented the issues by taking photographs. (*Id.* ¶ 47.) GEO states that the Training Administrator's duties included overseeing just these sorts of upkeep issues. (*Id.* ¶ 13.) Quick disputes this characterization, and asserts that training

at the firing range sometimes involved SWAT-style exercises that required the range to appear less than pristine, that such training was occurring at that time, accounting for the firing range's state of disrepair, and that no one had ever told him that he was responsible for maintaining the clothing issuance room. (ECF No. 38 ¶¶ 46–47.)

On August 4, 2016, AW Staiger visited the armory and determined that the armory's firearms certification and "Do Not Issue" lists[4] had not been updated in two months, responsibilities GEO believes belonged to the Training Administrator. (ECF No 28 ¶¶ 48–49.) Quick conceded that he was responsible for the firearms list but testified that he only needed to update the list annually. (ECF No. 39-1 at 87:10–11.) Quick asserts that the records were up to date as of at least June 20, 2016 — well within the annual update requirement — and that MVCC's human resources manager was responsible for maintaining the "Do Not Issue" list, not Quick as Training Administrator. (ECF No 38 ¶ 49.) At some point prior to August 4, 2016, Quick also informed Warden Kuta that he had not been provided with sufficient information to fully update the certification list. (ECF No. 39-1 at 89:23–90:2.)

On October 17, 2016, Quick received a second written reprimand (the "October 17 Reprimand") for failure to properly oversee maintenance of MVCC's training center, as AW Staiger had identified, as well as his failure to update the firearms certification and Do Not Issue firearms lists. (ECF No. 28 ¶ 51.) Quick argues that the October 17 Reprimand was unmerited because he had updated the list for which he was responsible and was not responsible for the other list or for upkeep of the training center but does not dispute that he received it. (ECF No.

---

[4] These lists track MVCC staff who remain up to date in firearms certifications and are permitted to carry firearms in the course of their duties. (ECF No. 38 ¶ 49.)

38 ¶ 51.) The October 17 Reprimand also stated that AW Staiger had given Quick "clear instructions" to correct the state of the training center and firing range, but Quick states that he was unaware that there was an issue until he received the October 17 Reprimand. (ECF No. 39-1 at 82:8–12.) There is no documentation in the record that Quick appealed the October 17 Reprimand.

On that day, Quick met with Warden Kuta, AW Staiger, and Edwin Uhlig, MVCC's Human Resources Manager, to discuss Quick's job performance. (ECF No. 28 ¶ 52.) Warden Kuta told Quick of his belief that Quick was operating at only thirty percent of expectations and that Quick was to coordinate all future maintenance requests with Assistant Warden Charis Proud ("AW Proud"). (*Id.*)

### 3. Quick Receives a Final Reprimand for Failing to Provide Warden Kuta with a Training Report and for Scheduling Vacation Without Lining up a Replacement Trainer

Also on October 17, 2016, as MVCC prepared for an annual audit, MVCC discovered that certain subcontractors had not received their required Annual Refresher Training ("ART").[5] (*Id.* ¶ 53.) The parties dispute whether someone at MVCC had set a deadline of September 30, 2016, for ART completion, or if the training was to be completed by the end of the year; regardless, Quick asserts that he was unaware that any party desired completion of this training by September 30, 2016. (ECF No. 38 ¶ 53.) On November 13, 2016, Quick informed Warden Kuta of two MVCC contractors who had not yet completed their ART, though he asserts that if

_____
[5] It is unclear whether Quick received the October 17 reprimand before or after MVCC discovered that its subcontractors had not received ART.

contractors had not yet completed yearly ART, the middle of November was the usual time to inform the warden. (*Id.* ¶ 54; ECF No. 28 ¶ 54.)

On November 21, 2016, approximately one month after his pectoral injury, Quick requested that Warden Kuta reschedule his SDO stint because he believed that performing both his duties as SDO and as Training Administrator would be too taxing. (ECF No. 28 ¶ 55.) In August 2016, MVCC assigned Quick to act as SDO during a week he was also scheduled to give training as part of his Training Administrator duties; Quick alleges that MVCC generally excused staff from their usual job responsibilities during their time as SDO—if this was a regular occurrence, Quick was not a beneficiary of that policy on this occasion. (ECF No. 28 ¶ 50; ECF No. 38 ¶ 50.) During his August session as SDO, Quick's cardiac condition allegedly limited his physical capabilities and he felt that he would be unable to perform SDO duties along with his Training Administrator duties simultaneously again. (ECF No. 38 ¶ 55.) Warden Kuta eventually granted this request. (*Id.* ¶ 56; ECF No. 38 ¶ 56.)

On November 22, 2016, Quick told Warden Kuta that, six months previously, he had scheduled a two-week vacation for January 2017,[6] and would be unavailable to deliver ART as part of his Training Administrator duties during that two-week period. (ECF No. 28 ¶ 57.) GEO asserts that Quick failed to line up a reliable substitute for this training, while Quick asserts that GEO has Alternate Training Administrators who fill in when the regular Training Administrator is unavailable, and that he understood that Mr. Heirtlein, an Alternate Training Administrator,

---

[6] It is not clear whether Quick scheduled the vacation at a point six months before the vacation or six months before he notified Warden Kuta.

stood ready to fill in for Quick while he was on vacation. (*Id.*; ECF No. 38 ¶ 57.) Warden Kuta approved Quick's vacation at some point after Quick requested the vacation. (ECF No. 38 ¶ 57.)

On December 7, 2016, Quick received a third and final written reprimand (the "December 7 Reprimand") about his performance, specifically relating to a failure to provide Warden Kuta with a report on training for MVCC staff for the third quarter, current through September 30, 2016, by September 30, 2016.[7] (ECF No. 28 ¶¶ 58–59.) Quick completed the report for Warden Kuta sometime shortly after September 30, 2016, as Warden Kuta signed off on it by October 5, 2016. (ECF No. 38 ¶ 60.) The December 7 Reprimand cited Quick's failure to complete ART training for MVCC staff by September 30, 2016.[8] (ECF No. 28 ¶ 61.) This delay allegedly placed MVCC out of compliance with its contract with the BOP and at risk of a finding of noncompliance during an audit. (*Id.* ¶ 64.) Quick admitted that, as of October 17, 2016, there were MVCC subcontractors who had not completed ART. (*Id.* ¶ 62.) The December 7 Reprimand noted that Quick had failed to coordinate maintenance with AW Proud and had, instead, tried to complete the maintenance on his own, leading to his injury of October 20, 2016. (*Id.* ¶ 63.) The December 7 Reprimand also criticized Quick's decision to take a two-week vacation during ART, without finding an appropriate substitute, although Quick contends that he had procured Mr. Heirtlein to fill in for him. (*Id.* ¶ 65.)

Quick appealed the December 7 Reprimand, which Warden Kuta ultimately denied two months after Quick appealed. (*Id.* ¶ 66; ECF No. 39-1 at 61–62.) In his appeal, Quick argued that GEO and MVCC had subjected him to a hostile work environment and, in support, cited an

---

[7] September 30, 2016, was a Sunday, on which Quick did not work.
[8] This is the alleged deadline for ART of which Quick was unaware (ECF No. 38 ¶ 64.)

instance in which AW Staiger allegedly stated to another MVCC employee that it would be a good job for Quick to "dig up grass between the sidewalks by the training center," a task well outside the duties of Training Administrator. (ECF No. 28 ¶ 66.) Responding to Quick's claim about AW Staiger's alleged comments, Warden Kuta informed Quick that MVCC had investigated and addressed the issue with AW Staiger and that Quick should let Warden Kuta know if he experienced any other instances of perceived harassment. (*Id.* ¶ 67.)

Quick testified that, at various points during his employment, he called GEO's employment hotline to report harassment and related concerns;[9] Quick states that he called this hotline on at least four occasions. (ECF No. 38 ¶ 74.) While MVCC's Human Resources department operated the hotline, Human Resources informed Warden Kuta when calls came in on the hotline. (*Id.* ¶ 75.) Warden Kuta does not recall any formal procedure for responding to calls on the hotline, nor does he recall any hotline calls either from Quick or referencing Quick— the hotline keeps complaints anonymous. (*Id.* ¶¶ 76–77; ECF No. 42-2 at 5:14–19.) Quick also alleges that MVCC and Warden Kuta engaged in a consistent practice of unlawfully forcing out employees with medical issues or protected employment status, referencing three separate incidents. (ECF No. 38 ¶¶ 78–82.)

## D. Quick Sends GEO Documents Through Unencrypted Email and GEO Terminates His Employment

On December 5, 2016, Quick emailed MVCC's Breaching and Emergency Plans ("Emergency Plans") to the BOP using GEO's usual email system rather than a special, encrypted email system. (*Id.* ¶68.) The parties dispute who has the responsibility for creating, maintaining,

---

[9] Quick does not provide specifics as to the substance of these claims.

and storing these plans; the manner in which they are stored and marked affects the documents' status as sensitive. (*See* ECF No. 39-1 at 134:1–137:18.) Quick denies that there was any policy specifically requiring that the Emergency Plans be sent to the BOP through an encrypted system; Warden Kuta admitted that there was no explicit policy, but testified that it was a matter of common sense to use the encrypted system when communicating with the BOP. (ECF No. 38 ¶ 71.) GEO updates these documents on an annual basis, and GEO alleges that updating the Emergency Plans was one of Quick's responsibilities. (ECF No. 28 ¶ 70.) Quick allegedly failed to timely update the Emergency Plans; as a result, MVCC staff attending ART on January 10, 2017, were unable to review the newest Emergency Plans. (*Id.*) Quick asserts that this inability was because of Warden Kuta's failure to provide critical information for, and sign off on, the updates. (ECF No. 38 ¶ 70.) Also in January 2017, Quick's 2016 performance evaluation rated Quick's job performance as "below expectations" and laid out an overview of how Quick could improve his performance. (ECF No. 28 ¶ 69.)

On March 3,[10] 2017, allegedly as a result of Quick's policy violation of communicating documents through unsecured email and his failure to update MVCC's Emergency Plans, GEO terminated Quick's employment. (*Id.* ¶ 71.) This termination came nearly three months after the allegedly serious offense of emailing sensitive documents over an unsecured system, nearly two months after failing to timely update MVCC's Emergency Plans, and almost a year after he returned from heart surgery.

---

[10] GEO's statement of facts states that Quick's employment was terminated on March 1, 2017; Quick testified that his last day was March 3, 2017. (ECF No. 28 ¶ 71; ECF No. 39-1 at 134:1.)

## IV. Procedural Background

Quick initially filed this lawsuit in the Court of Common Pleas of Clearfield County on April 9, 2018. (ECF No. 1-2 at 2.) GEO timely removed the case to this Court on May 8, 2018. (ECF No. 1.) Quick filed an Amended Complaint on May 14, 2018. (ECF No. 5.) After undergoing discovery, GEO filed for summary judgment on June 21, 2019. (ECF No. 26.) After a dispute regarding further discovery (*See* ECF Nos. 25, 30, 31, 32, 33, 34), Quick filed his Response on October 31, 2019. (ECF No. 37.) GEO filed a Reply and moved to strike certain of Quick's statements of fact in support of his Response, which this Court denied. (ECF Nos. 41, 43, 55.) Finally, GEO amended its Reply to Quick's statement of facts in support. (ECF Nos. 41, 58.)

## V. Legal Standard

This Court will grant summary judgment only "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact whenever "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and

-16-

draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

**VI. Discussion**

GEO argues that it is entitled to summary judgment on both Quick's hostile work environment and wrongful termination claims because: (1) Quick did not have a disability under either the ADA or PHRA; (2) Quick did not suffer an objectively hostile work environment; and (3) GEO terminated Quick for his performance issues, not for any perceived disability. The Court will address each argument in turn.

-17-

## A. GEO Is Not Entitled to Summary Judgment on Quick's Hostile Work Environment Claims

To establish an ADA[11] hostile work environment claim, Quick must show that: (1) he qualifies as disabled under the ADA; (2) he suffered unwelcome harassment; (3) the harassment was based upon his disability; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment; and (5) that GEO knew of or should have known of the harassment and failed to promptly remedy the harassment. *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999).

The Court will first address the threshold question of Quick's disability status, then proceed to the remaining elements.

### 1. A Reasonable Jury Could Conclude That GEO, MVCC, and Warden Kuta Perceived Quick as Disabled Under the ADA

#### a. The Parties' Arguments

GEO first argues that Quick cannot establish a *prima facie* case of hostile work environment because he cannot show that he was disabled, had a record of being disabled, or that GEO viewed him as disabled. (ECF No. 27 at 9.) Quick was not suffering from any physical or mental impairment during his employment that substantially limited him in his major life activities, and he therefore was not actually disabled. (*Id.* at 9–11.) Quick's only possible disabilities were his undergoing heart surgery in March 2016, as well as his later pectoral injury, and the record surrounding these conditions cannot support a finding that Quick was actually disabled at his

---

[11] Courts apply the same legal standard to both ADA and PHRA claims. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *See Wilson v. Iron Tiger Logistics, Inc.*, 628 F. App'x 832, 835–36 (3d Cir. 2015.). Accordingly, the Court will analyze Quick's ADA and PHRA claims—both for hostile work environment and wrongful termination—identically and only refer to Quick's ADA claims for the sake of simplicity.

termination because he had returned to work with no medical restrictions. (*Id.*) Quick's medical conditions did not restrict his ability to perform a broad range of jobs compared to the average person. (*Id.* at 13.) Quick cannot establish his hostile work environment claim because there is no evidence that he had a record of his being disabled nor that GEO relied on any such record in deciding to terminate Quick. (*Id.* at 13–14.) Finally, Quick cannot establish that GEO, or anyone employed at MVCC, viewed Quick as disabled as a result of his heart troubles. (*Id.* at 14–16.)

Quick responds that GEO is not entitled to summary judgment because the record demonstrates that Warden Kuta viewed him as having a disability.[12] (ECF No. 37 at 10–11.) Quick argues that Warden Kuta's decision to restrict Quick from performing all but deskwork evidences his perception that Quick was disabled and unable to complete his job duties effectively as a result of the disability. (*Id.* at 11.) Before his heart surgery, Quick's duties as Training Administrator involved making rounds to ensure that MVCC staff were undergoing training properly, a task that required nothing more physical than simply walking around, yet Warden Kuta restricted his ability to complete this task. (*Id.* at 11–12.) Warden Kuta also prevented Quick from performing his duties as an emergency preparedness officer, a job that only required inspecting emergency equipment, as well as scanning inmate ID cards at MVCC's cafeteria and walking back and forth between MVCC buildings. (*Id.* at 12–13.) These restrictions show Warden Kuta's perception of Quick as disabled and show his intent to discriminate against Quick based on his disability. (*Id.* at 13.) Warden Kuta's restrictions show: (1) GEO treated Quick as being disabled even though he had received medical permission to work according to his job description; (2) GEO viewed

---

[12] Quick does not argue that he either was disabled at any relevant time, or that he had a history of being disabled. The Court will therefore consider only whether GEO and Warden Kuta's perceived Quick as disabled.

Quick as being disabled only because of Warden Kuta's perceptions about heart surgery; and (3) GEO attributed to Quick a disability that did not exist. (*Id.*)

Quick then contends that not only do Warden Kuta's statements support Quick's claims that GEO perceived him as disabled, Warden Kuta's actions evidence that same perception. (*Id.* at 14.) Warden Kuta acted to have his restrictions enforced; for instance, denying Quick access to the main prison facility. (*Id.*) Quick also argues that actions taken based on his perceived disability status, even if misguided, can give rise to a claim for disability discrimination. (*Id.* at 15.) Warden Kuta's restrictions demonstrate that Warden Kuta and MVCC regarded Quick as disabled, giving rise to an ADA claim even though Quick was not actually disabled. (*Id.* at 15–16.)

Quick next asserts that Warden Kuta's restriction of Quick to what was, essentially, a desk job shows that Warden Kuta viewed Quick as incapable of performing a range of jobs. (*Id.* at 18.) Warden Kuta imposed his own restrictions, based on a misguided view of Quick's health and those limitations prevented Quick from being an effective Training Administrator. (*Id.* at 19–20.)

### b.  A Reasonable Jury Could Conclude That GEO Viewed Him as Disabled[13]

The ADA bars discrimination by covered employers against a "qualified individual" on the basis of disability with regard to conditions of employment.    42 U.S.C. § 12112(a). Discrimination includes "limiting, segregating, or classifying a[n] employee in a way that

---

[13] The ADA requires that, to state a "regarded as disabled" claim not only that the employer view the employee as disabled but that the employer subject the employee to prohibited discrimination based on that perceived disability. 42 U.S.C. § 12102(3)(A).  While this is one requirement, the Court will treat the requirement as two analytically distinct steps to state a claim for purposes of simplicity. *See Jakomas v. City of Pittsburgh,* 342 F. Supp. 3d 632, 652–53 (W.D. Pa. 2018) (applying single-step analysis to "regarded as disabled" claim).  Regardless of how the Court analyzes the requirements, Quick must establish both perception and harassment due to that perception to succeed on his ADA claims.

adversely affects the . . . status of such . . . employee because of the [employee's] disability." *Id.* § 12112(b)(1). A "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." *Id.* 12111(8). GEO does not dispute that Quick met the standard for a "qualified individual."

Under the ADA, there are three categories of disability: actual impairment, record of impairment, and perception as impaired. Specifically, the ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[14] 42 U.S.C. § 12102(1). As noted above, Quick does not contend that he was actually disabled or had a record of being disabled. *See supra* note 12. Accordingly, the Court will only consider whether GEO and Warden Kuta regarded Quick as disabled.

To meet the standard for "perceived impairment," Quick does not need to show that the perceived impairment limited or was perceived to limit a major life activity; major life activities include working. § § 12102(2)(A), (3)(A). A perceived impairment must be a physical or mental impairment, which the ADA's implementing regulations define as "any physiological disorder or condition" such as those affecting the cardiovascular system. § 12102(3)(A); 29 C.F.R. § 1630.2(h)(1). The impairment cannot be minor or transitory, and if the impairment that the employer views is objectively transitory and minor, the claim fails. § 12102(3)(B); *see Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (citing 29 C.F.R. § 1630.15(f)). The impairment is transitory if its "actual or expected duration" is six months or less. 12102(3)(B); *see,*

---

[14] In 2008, Congress amended the ADA to alter what a plaintiff must prove to prevail on a "regarded as" or "perceived as" claim. As the issues giving rise to Quick's claims began in 2016, the Court uses the amended framework in its analysis. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3555.

*e.g., Budhun*, 765 at 259–60 (holding that a broken bone in plaintiff's hand was a transitory and minor impairment because the duration was "temporary" and expected to last two months). Accordingly, the question is whether GEO perceived Quick as having only transitory or minor heart problems, or more severe medical issues.

For an employer to perceive that an employee is disabled, the employer must actually regard the employee as disabled or take an adverse employment action based on that perception. *Kelly*, 94 F.3d at 109; *see* 9 Larson on Employment Discrimination, § 153.09 (2d ed. 2019) (explaining that, to meet the standard for a "regarded as" claim, the plaintiff must show that he or she was subjected to unlawful discrimination because of a disability). An employer cannot misinterpret an employee's health information to conclude that the perceived disability limits the employee's job performance. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 190 (3d Cir. 1999). Even if the employer is innocently wrong about the extent of the employee's impairment, the employer has still violated the ADA if it takes adverse action against the employee as a result of that misperception. *Id.* at 191.

The analysis of an ADA perception claim focuses not on the plaintiff and his actual capabilities, but on the employer's perceptions of him. *Kelly*, 94 F.3d at 108–09. Here, Quick has produced sufficient evidence for a reasonable jury to conclude that GEO and Warden Kuta viewed him as disabled as the ADA defines the term. Under the ADA and its implementing regulations, a cardiac health issue can be perceived as an impairment. *See* 42 U.S.C. § 12102(3)(A); 29 C.F.R. § 1630.2(h)(1). Once Quick returned from his heart surgery, Warden Kuta placed him on "Dr. Kuta's" restrictions. (ECF No. 38 ¶ 31.) These restrictions limited Quick to MVCC's training center, although his duties required him to go to the main secured facility on rounds to

check on trainees, inventory emergency preparedness equipment, and scan inmate ID cards at meals in MVCC's dining room. (*Id.*) Quick testified at his deposition, and reaffirmed in his declaration,[15] that, upon his return from heart surgery, Warden Kuta told Quick that he had initiated the restrictions because he felt Quick had come back from heart surgery too early. (ECF No. 39-1 at 34:16–36:1.) Quick's testimony also indicates that other correctional officers were angry at Quick because these restrictions led to his escape from scanning IDs in the dining room, an activity many correctional officers disliked. (*Id.*)

This testimony would permit a reasonable jury to conclude that Warden Kuta viewed Quick as having a disability sufficient to rise to the ADA's standard. A reasonable jury could conclude that Warden Kuta limited Quick in such a way as to adversely affect his status at GEO because of his perceived disability. 42 U.S.C. § 12112(b)(1). A jury could also conclude that GEO did not perceive Quick's impairment as being either transitory or minor. The record reflects that Warden Kuta stated that he believed Quick should have remained off of work for a year to heal, following major surgery. (ECF No. 38 ¶ 31.) A year exceeds the six-month threshold for "transitory" impairments, and Warden Kuta's placing Quick on "Dr. Kuta's" restrictions indicates that Warden Kuta felt that Quick's perceived impairment was not minor. Open heart surgery, specifically quadruple bypass surgery, is unlikely to be viewed by anyone as "minor"

---

[15] The Court can properly consider Quick's declaration (ECF No. 39-10) where it is not in conflict with his prior testimony, or where he gives reasons to explain contradictions—the Court will not apply the sham affidavit doctrine to Quick's declaration in its entirety. The "sham affidavit" doctrine holds that a party may not create a genuine dispute of material fact and defeat summary judgment simply by filing an affidavit of record disputing the affiant's own sworn testimony unless the affiant provides a plausible reason for the contradiction. *See Baer v. Chase*, 392 F.3d 609, 623–24 (3d Cir. 2004).

surgery, and GEO has produced no evidence that Warden Kuta viewed Quick's heart issues as minor.

It is not just Warden Kuta's alleged statements, but the actions Quick alleges Warden Kuta took to back up those words that demonstrates that Warden Kuta may have viewed Quick as disabled. In addition to stating that he was placing Quick on "Dr. Kuta's" restrictions, Warden Kuta enforced those restrictions, refusing Quick access to various areas of MVCC's campus. (ECF No. 39-1 at 34:16–36:1.)

The facts here are analogous to those in *Thompson v. AT&T Corp.*, No. 2:3-cv-33, 2006 WL 89931 (W.D. Pa. Jan. 12, 2006). In *Thompson*, the plaintiff experienced either a panic or anxiety attack while at work and applied for medical leave. *Id.* at *1. Thompson's supervisor viewed her absences due to these attacks negatively and disciplined her on several occasions. *Id.* at *1–2. Thompson established that a jury could find that her employer viewed her as disabled based on statements of her supervisor that she was unable to perform certain jobs as a result of her attacks.[16] *Id.* at *6. So it is in Quick's case. Warden Kuta made statements, and took actions that backed those statements up, to Quick that indicated that Warden Kuta believed that Quick was unable to perform his job duties as a result of his coming back to work early—*i.e.*, being disabled. These restrictions were in spite of the fact that Dr Bhatnagar's letter to MVCC cleared Quick to work per his job description. (ECF No. 28 ¶ 35.)

GEO's arguments to the contrary are unavailing. First, GEO argues that Quick relies only upon his own "self-serving" testimony about what Warden Kuta told him when he returned to

---

[16] *Thompson* was decided prior to the 2008 ADA amendments, arguably bolstering Quick's case as those amendments lowered the standard to succeed on his claims.

work. This is a disputed fact that, at summary judgment, this Court must resolve in Quick's favor and assume that Warden Kuta made the alleged comments. *See* Fed. R. Civ. P. 56. GEO concedes that, for the purposes of its Motion, Warden Kuta made the alleged comments, but argues that they are insufficient to support Quick's claims. (ECF No. 27 at 15–16.) As detailed above, this contention is incorrect.

To support its argument, GEO relies on this Court's decision in *Litzinger v. Allegheny Lutheran Social Ministries*, No. 3:15-cv-306, 2017 WL 3089022 (W.D. Pa. July 20, 2017). In *Litzinger*, the plaintiff returned to work after cardiac-related health issues with no medical restrictions— like Quick. *Id.* at *1–2. After her return, one of Litzinger's supervisors told her to "take it easy" and that she was "concerned for" Litzinger's health. *Id.* at 2. This Court granted summary judgment to Litzinger's employer. *Id.* at 1. However, *Litzinger* is not applicable here because, in that case, there was no evidence that Litzinger's employer placed restrictions on her as a result of her heart condition, or made remarks connecting any restrictions to her medical issues. Mere words are not the same as actual restrictions, and Quick has alleged that Warden Kuta actually placed restrictions on him. Accordingly, GEO's reliance on *Litzinger* is misplaced, and the Court will proceed to address the remaining aspects of Quick's claims.

## 2. Quick Can Establish the Remaining Elements of His *Prima Facie* Case

Having determined that Quick has established the first element of his case, that a reasonable jury could conclude that GEO viewed him as disabled, the Court turns to the remaining elements of Quick's claim: (1) Quick suffered unwelcome harassment; (2) the

harassment was based upon his disability;[17] (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment; and (4) that GEO knew of or should have known of the harassment and failed to promptly remedy the harassment. *Walton*, 168 F.3d at 667.

### a. The Parties' Arguments

GEO next argues that Quick's hostile work environment claim fails because he cannot establish that he suffered any harassment because of any disability. (ECF No. 27 at 16.) The fact that Quick had a poor relationship with MVCC staff, including Warden Kuta, cannot support a hostile work environment claim, because a bad relationship or poor work environment must be based on a disability—which Quick did not have. (*Id.* at 16–17.) The incidents that Quick cites in support of his claimed harassment do not rise to the level of harassment the ADA requires for hostile work environment claims. (*Id.* at 17–19.) The only connection Quick has identified between his work environment and any perceived disability is the fact that his work relationships began to deteriorate after he had his heart surgery. (*Id.* at 19.)

GEO continues that Quick cannot show that any harassment rose to a severe or pervasive level. (*Id.*) Even if Quick subjectively found his work environment at MVCC hostile, a reasonable person in the same protected class would not find the same environment similarly hostile. (*Id.* at 20.) Quick is trying to connect GEO's legitimate disciplinary actions with isolated instances of facially neutral comments to withstand summary judgment but cannot show that any of these actions were in any way connected to a disability. (*Id.*) Further, the fact that most of the incidents

---

[17] Courts generally collapse that suffering unwelcome harassment and its connection to perceived disability prongs into one analytical step. *See, e.g.*, *Walton*, 168 F.3d at 667.

Quick identifies are disciplinary actions resulting from performance defects or policy violations means that the few remaining incidents did not occur with sufficient frequency to rise to a pervasive level. (*Id.* at 21.) Neither were these incidents sufficiently severe to support a claim of a hostile work environment, nor did they relate to a disability. (*Id.* at 21–22.)

Quick responds that he endured unwelcome harassment based on his perceived disability. (ECF No. 37 at 20.) Warden Kuta added responsibilities to Quick's duties which interfered with Quick's health, like forcing him to do maintenance work himself, something MVCC had never previously had its Training Administrators do. (*Id.* at 21.) Warden Kuta then subjected Quick to an escalating series of disciplinary actions for failure to comply with these unreasonable work expectations, leading to Quick's termination. (*Id.* at 21–24.) Each of these disciplinary actions was flawed and motivated by Quick's perceived disability. (*Id.* at 24.)

Quick next argues that the number of these disciplinary events, and the period over which they occurred, did rise to the level of severe or pervasive. (*Id.* at 25.) Warden Kuta's requirement that Quick perform manual labor objectively interfered with his ability to properly discharge his duties as Training Administrator and also caused his pectoral injury. (*Id.* at 25–26.) Warden Kuta's increased expectations, for Quick to perform maintenance, organize clothing in the issuance room, and provide reports by deadlines of which he was unaware, also objectively impacted his job performance and led to arbitrary disciplinary actions. (*Id.* at 26.)

Finally, Quick contends that GEO does not contest that it either knew of or should have known of the harassment Quick suffered at Warden Kuta's hands, implicitly invoking the doctrine of respondeat superior. (*Id.* at 27.)

## b. A Reasonable Jury Could Conclude That Quick Suffered Unwelcome Harassment Connected to His Perceived Disability

To sustain a hostile work environment claim, a plaintiff must show that his employer subjected him to unwelcome harassment connected to his disability—an unpleasant work environment or bad relationship with a supervisor is not enough. *Walton*, 168 F.3d at 667; *see also Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability."). Accordingly, it is not enough for Quick to show that he suffered an unpleasant work environment; he must show that he suffered it because GEO perceived him as disabled. The harassment must be "because of" the employee's perceived disability. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). Instances of unwarranted discipline and the imposition of menial tasks for senior employees, if based on disability status, can be sufficient to defeat summary judgment on a hostile work environment claim. *Syed v. YWCA of Hanover*, 906 F. Supp. 2d 345, 357 (M.D. Pa. 2012).

Quick has shown sufficient evidence from which a reasonable jury could conclude that he suffered harassment as a result of his perceived disability. Quick cites several instances of discipline from GEO and its employees to support his claim, all of which occurred in the span of less than a year after he returned from heart surgery: (1) for improperly conducting the inmate count; (2) for improperly maintaining the firing range and training center; (3) for failing to update MVCC's firearms list; (4) for failing to provide a training report; (5) for failure to timely complete ART for MVCC employees; (6) for personally performing maintenance work; (7) for failure to timely submit a second report; (8) for taking vacation without approval; (9) for emailing

documents to the BOP without using the secured system; and (10) for failing to update MVCC's Emergency Plans. (ECF No. 37 at 21–24.) Quick asserts that he deserved none of these instances of discipline and that they were each part of a campaign of discipline connected to his perceived disability in order to generate pretext to terminate him.

GEO argues that Quick has produced no evidence that these disciplinary actions were due to his disability, and that Quick's argument that the disciplinary actions must be disability-related because he had never had disciplinary issues is misguided. (ECF No. 27 at 18–19.) Quick had recently been promoted to Training Administrator and, therefore, his past record as a correctional officer is immaterial. (*Id.*) These arguments are unavailing. Quick testified that he effectively served as MVCC's Training Administrator for ten months prior to his official promotion to the position and that he received an award for his performance. (ECF No. 39-1 at 60:21–61:18.) Quick also testified that Warden Kuta placed restrictions on his freedom to move around MVCC as a result of returning from his surgery earlier than Warden Kuta believed proper but then also added additional duties for Quick to complete, then disciplined him for a failure to complete those duties. (ECF No. 39-1 at 34:16–36:1.) A reasonable jury could conclude that Warden Kuta applied the restrictions due to his perception of Quick as disabled, then added additional duties to form grounds to terminate him.[18] Quick received the April 29 Reprimand just three days after he returned from his heart surgery, and nearly ten months after the improperly conducted inmate count that gave rise to the discipline. (ECF No. 38 ¶ 43.) A reasonable jury could conclude that Warden Kuta issued the April 29 Reprimand because of Quick's perceived disability and that this

---

[18] This inference also supports Quick's claims that GEO's decision to terminate him was pretextual, as the Court discusses in detail below, *infra* Section VI.B.3.

perception infected Kuta's later disciplinary actions, both issuing reprimands to Quick and denying his appeals. Quick has also produced evidence that GEO had closed the investigation, which would only occur when the entire disciplinary process was completed, including issuance of discipline. (*Id.*) This closing of the investigation, on or before April 6, 2016, did not recommend that MVCC discipline Quick, although Warden Kuta later decided to do so. (*Id.*) Accordingly, a jury could conclude that the extensive list of disciplinary actions Quick cites were harassing in nature and based on his perceived disability.[19]

GEO's reliance upon several cases to support its argument is misplaced. GEO cites several cases from district courts within the Third Circuit to argue that Quick is "bootstrapping" alleged discrete acts of discrimination into a hostile work environment claim. *See Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315 (D. Del. 2019); *Helvy v. Allegheny Cty.*, No 2:14-cv-1686, 2015 WL 672262 (W.D. Pa. Feb. 17, 2015); *Gale v. UPMC Horizon*, No. 2:12-cv-617, 2013 WL 5534238 (W.D. Pa. Oct. 7, 2013).

In *Helvy*, the plaintiff, an African American woman, was repeatedly disciplined for failure to fulfill work expectations, while white co-workers were allegedly given less harsh discipline for similar conduct; she brought claims of disparate treatment, hostile work environment, and retaliation under Title VII or the Civil Rights Act of 1964. 2015 WL 672262 at *1. The Court stated, that a hostile work environment claim cannot survive if it is solely based upon the same allegations pleaded in a disparate treatment claim—something more than just discipline is

---

[19] Quick also cites as evidence of GEO and Warden Kuta's discriminatory animus, several similar proceedings against GEO and Warden Kuta either currently pending before this Court or filed with the Equal Employment Opportunity Commission. (ECF No. 38 ¶¶ 78–82.) Although the Court expresses no opinion on the admissibility of such material, it notes that such evidence, if admitted at trial, could be used to show a discriminatory animus towards Quick on Warden Kuta's part. *See* Fed. R. Civ. P. 404(b)(2).

-30-

needed, allegations of pervasive behavior by the employer that make work unbearable. *Id.* at *3–

4. Here, Quick is not bringing a disparate treatment claim, only claims for hostile work environment and wrongful termination. Quick has also brought forth evidence to show that discriminatory animus motivated Warden Kuta's disciplinary actions and that these actions amounted to harassment. *Lampkins* also similarly involved a disparate treatment claim. 383 F. Supp. 3d at 319. *Gale* is inapposite because the disciplinary actions alleged occurred over the span of nearly twenty years, whereas Quick alleges ten instances occurring in the span of less than a year. *See* 2013 WL 5534328 at *7.

Quick has produced sufficient evidence for a reasonable jury to conclude that he suffered harassment as a result of his disability.

### c. A Reasonable Jury Could Conclude That Quick's Harassment Was Severe or Pervasive.

To state an ADA hostile work environment claim, the plaintiff must not only suffer harassment connected with a disability, but the harassment must be severe or pervasive enough to alter conditions of employment and create an abusive working environment. *Walton,* 168 F.3d 667. The work environment must be "objectively hostile;" the plaintiff's perceptions of hostility, alone, are insufficient. *Id.* This determination is based on the totality of the circumstances and includes (1) the frequency and severity of the discriminatory conduct; (2) whether the conduct physically threatens or humiliates the plaintiff or is merely an "offensive utterance;" (3) and whether the harassment "unreasonably interferes" with the plaintiff's performance. *Id.* To be pervasive, the alleged incidents supporting the hostile work environment claim cannot be merely "episodic," they must be "continuous and concerted." *Faragher v. City of Boca Raton,* 524 U.S. 775,

787 n.1 (1998).[20] Jokes, minor or occasional teasing, and infrequent uses of abusive language do not give rise to a hostile work environment as the ADA does not require a "happy or even a civil workplace." *Ballard-Carter v. Vanguard Grp.*, 703 F. App'x 149, 152 (3d Cir. 2017). Determining whether an employee suffered a sufficiently severe or pervasive environment to prevail on a hostile work environment claim is generally unsuited for summary judgment because that determination is "quintessentially a question of fact." *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 429 (E.D. Pa. 2010).

Here, a reasonable jury could conclude both that Quick perceived his work environment as hostile and that it was objectively hostile. A jury could conclude that the alleged discriminatory conduct was part of a concerted effort, occurring on essentially a monthly basis, between when Quick returned from heart surgery until GEO terminated him in March 2017. (ECF No. 37 at 21–24.) As discussed above, Quick has produced sufficient evidence from which a reasonable jury could conclude that disciplinary actions were discriminatory harassment based on his perceived disability. *See supra* Section VI.A.2.b. A reasonable jury could conclude that Warden Kuta's restrictions and additional duties unreasonably interfered with Quick's ability to complete his job; for instance, in limiting Quick's ability to access various areas of the MVCC complex, Quick was unable to complete certain of his duties. (ECF No. 38 ¶ 31.) Warden Kuta allegedly directed Quick to perform maintenance tasks himself, leading to Quick's pectoral injury, and further limiting his job performance. (*Id.* ¶ 55.) Warden Kuta also allegedly withheld approval of MVCC's Emergency Plans, refused to excuse Quick from his normal duties during Quick's time

---

[20] Although *Faragher* was a Title VII case, not an ADA case, courts often use identical frameworks for analyzing hostile work environment claims under both statutes. *See Walton*, 168 F.3d at 666–67.

as SDO, and created arbitrary deadlines for Quick that Quick was unable to meet. (*Id.* ¶¶ 19, 53, 70).

Addressing the factors this Court considers when determining whether the harassment was severe or pervasive: first, the disciplinary actions, combined with various other instances of potentially discriminatory conduct, occurred on approximately a monthly basis from the time Quick returned from heart surgery until GEO terminated his employment. (ECF No. 27 at 21–24.) This course of conduct was potentially severe—it may have resulted in physical injury to Quick, as well as his eventual termination. (*Id.*) Performing maintenance work led to Quick's injury, and the highly restrictive limitations Warden Kuta placed upon Quick when he returned from medical leave potentially subjected Quick to humiliation from MVCC's other staff; for instance, Warden Kuta's limitations prevented Quick from scanning inmate IDs in MVCC's cafeteria, a job most MVCC staff found unpleasant but that Quick enjoyed. (ECF No. 38 ¶ 31.) Finally, a reasonable jury could conclude that Warden Kuta's restrictions, the additional duties he imposed on Quick, and his refusal to provide Quick information necessary to complete tasks, objectively and unreasonably interfered with his duty to timely update the plans. (*Id.* ¶ 19, 31, 53, 55, 70.)

GEO's arguments fail to show that it is entitled to summary judgment. GEO's principal argument can be reduced to the following chain of logic: (1) GEO has inherent authority to discipline its employees for violations of its policies; (2) Quick does not contest the factual circumstances underlying the disciplinary actions Warden Kuta took; (3) Quick has therefore violated GEO's policies; and (4) GEO may discipline Quick for these policy violations and this Court should not look for reasons that GEO disciplined Quick beyond those policy violations.

-33-

(ECF No. 27 at 20–21.) GEO further argues that the Court cannot look into these disciplinary actions because Quick appealed them, which Warden Kuta denied. (*Id.* at 20.) GEO then asserts that, with the Court unable to consider the disciplinary actions, Quick's complaints about a hostile work environment fail as a matter of law because they are neither severe nor pervasive, nor connected with his disability. (*Id.* at 21–22.)

GEO's argument that the Court must accept GEO's rationale for disciplining Quick on its face fails because Quick has provided sufficient evidence from which a reasonable jury could conclude that Warden Kuta issued these disciplinary actions as harassment based on Quick's perceived disability. *See supra* Sections VI.A.1.b, VI.A.2.c. Accordingly, the Court's consideration of those actions is appropriate. Additionally, the fact that Quick appealed the disciplinary actions and GEO upheld them is immaterial in this case because Warden Kuta, who may have discriminated against Quick in the first place by issuing the disciplinary actions, was GEO's agent who upheld them—a less than impartial figure.

GEO also attempts to persuade this Court of its position by demonstrating how the cases Quick cites in support of his position actually favors granting summary judgment. These arguments, like GEO's arguments discussed above, are unpersuasive. Quick's primary authority is *Syed*, 906 F. Supp. 2d 345. (ECF No. 37 at 25–26.) GEO contends that unlike in *Syed*, Quick did not miss work directly as a result of disability discrimination, arguing that Quick skips steps in a chain of causation. However, a reasonable jury could conclude that disability discrimination resulted in Quick missing work: (1) GEO instructs Quick to personally perform maintenance work as part of a campaign to generate pretext to discharge a disabled Quick; (2) Quick attempts to perform the required maintenance; (3) Quick receives his pectoral injury while performing

maintenance GEO instructed him to perform; and (4) Quick misses work due to his injury—a direct causal chain between disability discrimination and missing work.

Accordingly, Quick has produced sufficient evidence from which a reasonable jury could conclude that Quick suffered severe or pervasive harassment based on a perceived disability.

### d. GEO Knew or Should Have Known of Quick's Complaints and Failed to Take Proper Remedial Action

In order to establish his case of hostile work environment, Quick must, finally, show that GEO either knew of or should have known of the harassment and failed to promptly remedy it. *Walton*, 168 F.3d at 667. An employer is subject to vicarious liability for hostile work environments that the employee's immediate supervisor creates. *Faragher*, 524 U.S. at 807 (1998). Warden Kuta was Quick's immediate supervisor. (ECF No. 39-1 at 58:3–6.)

GEO does not contest that it either knew of or should have known of Quick's complaints, or that it failed to promptly remedy them. Quick has also produced evidence from which a reasonable jury could conclude that GEO knew of or should have known of his claims; namely, his several calls to GEO's employment complaints hotline. (ECF No. 38 ¶¶ 74–77.) GEO evidently did not promptly act to remedy his grievances as GEO terminated Quick. Quick has established the final element of his hostile work environment claim.

As Quick has produced sufficient evidence form which a reasonable jury could conclude that GEO subjected Quick to a hostile work environment because it perceived him as disabled, the Court denies GEO's Motion with respect to Quick's hostile work environment claims.

### B. GEO Is Not Entitled to Summary Judgment on Quick's Wrongful Termination Claims

Under the ADA, unlawful discrimination includes termination of employment based on disability status. 42 U.S.C. § 12112(a). The *McDonnell Douglas* burden-shifting framework applies

to ADA wrongful termination claims.[21] *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996). The *McDonnell Douglas* framework has three steps: (1) the employee must first make out a prima facie case of unlawful discrimination; (2) then, the employer shoulders the burden to articulate a legitimate, non-discriminatory reason for terminating the employee; and (3) the employee must prove that the employer's proffered legitimate reason is pretextual, *i.e.*, a cover for unlawful discrimination. *Id.* To show a prima facie case of unlawful discrimination, the employee must establish that he or she: (1) has a disability or record of disability or was perceived as disabled by the employer; (2) is a "qualified individual;" and (3) suffered an "adverse employment action" due to that disability, *i.e.*, that there is a causal connection between a disability and an adverse employment action. *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002).

As discussed, *supra* Section VI.A.1.b, a reasonable jury could conclude that GEO viewed Quick as disabled and that Quick was a "qualified individual." Further, GEO does not contest the fact that Quick suffered an adverse employment action—namely, termination. Accordingly, the Court will only address only whether Quick suffered an adverse employment action as a result of that disability and whether GEO has articulated a legitimate, non-discriminatory, and non-pretextual reason for terminating Quick.

---

[21] As with hostile work environment claims, the same framework that governs this Court's analysis of ADA claims also applies to the PHRA. *Wilson v. Iron Tiger Logistics, Inc.*, 628 F. App'x 832, 835–36 (3d Cir. 2015). Accordingly, the Court will refer only to Quick's ADA claims for the sake of simplicity.

### 1. Quick Has Established a Prima Facie Case of Wrongful Termination

#### a. The Parties' Arguments

GEO argues that it is entitled to summary judgment on Quick's wrongful termination claims because Quick cannot establish a prima facie case of wrongful termination under the ADA or that his termination was pretextual. (ECF No. 27 at 22.)

GEO asserts that Quick's wrongful termination claim fails because he cannot establish a connection between any disability he may have had and his termination. (*Id.* at 23–24.) Quick's heart surgery occurred over a year before his termination and ten months after his return from surgery; this temporal distance is too great to support a causal connection between alleged disability and termination. (*Id.* at 24.) Quick returned to work, without medical restrictions, over four months before his termination, a length of time also too great to show a causal connection. (*Id.*) Even if GEO perceived Quick as disabled, or having a record of disability, his claim fails because there is a complete absence of evidence that Warden Kuta viewed Quick as disabled or relied on a record of his disability in terminating Quick. In addition, Quick's discipline for violating inmate count procedures began under then-Warden Wigen, not Warden Kuta, and Quick's argument that Warden Kuta reopened the investigation while Quick was on leave is unsupported. (ECF No. 40 at 6–8.) Quick's argument that the discipline that Warden Kuta subjected him to shows a causal connection fails because Warden Kuta disciplined Quick several times over several months, too remote to permit an inference of causation. (*Id.* at 8.)

Quick replies that he can establish the elements of his claim for wrongful termination. Quick states that GEO and Warden Kuta viewed him as disabled and terminated him as a result of that view. (ECF No. 37 at 27–28.) Warden Kuta's actions were causally related to Quick's

disability because Quick's first reprimand occurred just three days after he returned from disability leave in April 2016. (*Id.* at 28.) Warden Kuta's restrictions on Quick's duties were also related to his perceived disability because he felt that Quick should have taken longer away from work to recover. (*Id.*) Although Warden Kuta did not terminate Quick immediately following his return to work, he altered the conditions of Quick's employment, and the discriminatory animus motivating that alteration continued through Quick's ultimate termination. (*Id.* at 28–29.) The connection of the initial discipline with Quick's return, as well as the lengthy list of unmerited disciplinary proceedings, show that there is causation, under a theory of unusually suggestive proximity between disability and discrimination and a pattern of antagonism plus timing. (*Id.* at 29–30.)

### b. A Reasonable Jury Could Conclude That Quick Suffered an Adverse Action as a Result of His Perceived Disability

There are two ways to establish a causal connection under the ADA: (1) where the temporal proximity of the alleged disability and the adverse employment action are "unusually suggestive," no other evidence is required; or (2) where the timing is not "unusually suggestive," but there is other evidence of discrimination or a "pattern of antagonism." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997). It is not necessary that the final adverse action, *i.e.,* termination, occur immediately after the employee's disability status becomes apparent; a pattern of discriminatory action can begin shortly after the beginning of the disability and culminate months later. *See Marra*, 497 F.3d at 302. A wrongfully terminated employee may rely on a "broad array" of evidence to show a causal connection between termination and disability status. *Marra*

*v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007).[22] Where the temporal proximity is not "unusually suggestive" of a causal connection, this Court can look to the period between the disability becoming apparent and the adverse action for proof of a causal connection. *Id.* Sources of that proof can include antagonistic conduct or animus towards the employee, or other circumstantial evidence that, in its totality, permits an inference of causation; for instance, inconsistent reasons for termination or discriminatory treatment of other employees. *Id.*

Considering the record in its entirety, Quick has produced sufficient evidence for a jury to conclude that there was a causal connection between Quick's termination and his perceived disability. Leaving aside the issue of whether the temporal proximity was "unusually suggestive,"[23] Quick has made out the final element of his prima facie case. Quick has produced evidence that GEO subjected him to a pattern of repeated harassment that could have been connected to his perceived disability after he returned from heart surgery. *See supra* Section VI.A.1.b. Quick's evidence would also permit a reasonable jury to discern animus towards Quick on the part of Warden Kuta and others at MVCC. Finally, Quick has introduced evidence of potential other instances of unlawful discrimination on the part of Warden Kuta and GEO occurring at MVCC around the time Quick complains of the same.[24] (ECF No. 38 ¶¶ 79–82.) Quick has established his prima facie case of wrongful termination, and the Court now continues to consider the remaining elements of the *McDonnell Douglas* framework.

---

[22] *Marra* involved a PHRA retaliation claim, but as the Court has noted above, courts interpret the PHRA and federal employment discrimination statutes, such as Title VII and the ADA, the same way; likewise, courts apply highly similar frameworks in ADA cases as they do in Title VII cases. *See supra* nn. 11, 20.

[23] Quick does not appear to be arguing that the timing of his termination is "unusually suggestive."

[24] The Court expresses no view on the respective merits of those cases, one of which is currently pending before it.

## 2. GEO Has Produced Legitimate, Non-Discriminatory Reasons for Terminating Quick

GEO then argues that it had legitimate, non-discriminatory reasons to terminate Quick's employment. (ECF No. 27 at 25.) Quick: (1) emailed sensitive documents through unsecured servers; and (2) failed to properly update MVCC's Emergency Pans, interfering with training at MVCC. (*Id.*; ECF No. 28 ¶ 71.) Even if Quick had not performed as expected, GEO may terminate the employment of any employee, so long as the reasons behind the termination are free of discriminatory animus. (*Id.* at 25–26.) Quick does not dispute that GEO has set forth a legitimate, non-discriminatory reason to terminate him—namely, performance issues—so the Court holds that GEO has met its burden under *McDonnell Douglas*.

## 3. A Reasonable Jury Could Conclude that GEO's Proffered Reasons for Terminating Quick are Pretextual

### a. The Parties' Arguments

GEO argues that even if Quick can establish a prima facie case, he cannot establish that GEO's legitimate, non-discriminatory reasons for termination Quick were pretextual. (ECF No. 27 at 26.) Quick has not produced evidence from which a reasonable factfinder could disbelieve GEO's legitimate reasons and conclude that those reasons could not be the real reasons or find that GEO acted through unlawful discrimination. (*Id.* at 26–27.) Quick, relying only on his own personal beliefs, also fails to show that GEO and MVCC treated the Emergency Plans as non-sensitive and therefore transmittable over the unsecured email system. (ECF No. 40 at 8–9.) Warden Kuta's inability to remember exactly when he communicated to MVCC staff that communications with the BOP were to occur over the secured email system does not mean that he never made such a communication, and he had disciplined an MVCC employee who had

failed to use the secured system. (*Id.* at 9–10.) Finally, Quick's opinion that Warden Kuta imposed arbitrary deadlines is not enough to establish pretext; even if the deadline was or was not arbitrary, Quick failed to update the Emergency Plans by the deadline. (*Id.* at 10.)

Quick then argues that GEO's proffered non-discriminatory reasons for terminating Quick are pretextual. (*Id.* at 30.) The documents that Quick emailed through the unsecured email system were not sensitive, as MVCC did not store them on a secured server, and it was therefore not a policy violation to use the unsecured email system to send the documents. (*Id.* at 31.) Warden Kuta's testimony buttresses the conclusion that GEO's reasons for terminating Quick were pretextual because: (1) Warden Kuta created the documents and did not label them as sensitive; (2) Warden Kuta stored them on an unsecured server, reflecting no desire to keep them secure; (3) Quick had no reason to believe that the documents were sensitive; and (4) Warden Kuta's testimony that, contrary to MVCC's policy on using the secured system, GEO informed MVCC staff at some point in time, in general terms and through an unknown manner of communication, that MVCC staff should make any communications of this nature through the secured system. (*Id.* at 33.)

Quick further addresses the issue of pretext concerning his alleged failure to update the Emergency Plans, asserting that he could not have timely updated the plans because Warden Kuta failed to provide him with necessary information to do so. (*Id.* at 34.) The only deadline that existed for updating the Emergency Plans was one Warden Kuta arbitrarily imposed; MVCC did not update Emergency Plans on a particular schedule, only as new information came to the prison. (*Id.* at 34.) In January 2017, Quick decided to update the plans, drafted new plans, and sent them to Warden Kuta; Warden Kuta never signed off on the plans, which would have

finalized them. (*Id.*) Warden Kuta later admitted that Quick did not violate any policy of which he was aware. (*Id.* at 34–36.)

### b. Quick Has Produced Sufficient Evidence to Show that GEO's Reasons for Terminating Him Were Pretextual

In order to establish his wrongful termination claim, Quick must also present evidence—direct or circumstantial—from which a reasonable jury could: (1) disbelieve GEO's legitimate, non-discriminatory reasons for terminating Quick; or (2) believe that it is more likely than not that GEO terminated Quick because of his disability, *i.e.*, that, but-for his disability, GEO would not have terminated Quick. *Fichter v. AMG Resources Corp.*, 528 F. App'x 225, 228 (3d Cir. 2013) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). To convince a jury to disbelieve GEO's proffered reasons for terminating Quick, Quick must discredit each legitimate, non-discriminatory reason for his termination. *Id.* This discrediting can take the form of establishing that GEO's reasons suffered from "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable jury could disbelieve them. *Krouse*, 126 F. 3d at 504.

In determining whether GEO's proffered reasons are pretextual, this Court may consider evidence that shows that GEO previously discriminated against Quick or other employees who are similarly disabled, or that GEO treated similarly situated person who are not perceived as disabled more favorably that Quick. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644–45 (3d Cir. 1998).

GEO justifies terminating Quick as legitimate and non-discriminatory for the following two reasons: (1) Quick sent sensitive documents to the BOP over the unsecured email system; and (2) Quick failed to timely update MVCC's Emergency Plans. (ECF No. 28 ¶ 71.) Accordingly,

Quick must produce evidence sufficient for a jury to conclude either that both reasons are pretextual or that GEO more likely than not terminated Quick because it perceived him as disabled.

### i. A Reasonable Jury Could Conclude that GEO Did Not Consider the Documents Quick Sent To Be Sensitive or that GEO Had A Policy of Using the Secured Server To Communicate with the BOP

Quick does not contest that he emailed certain documents to the BOP using GEO's unsecured system. (ECF No. 28 ¶ 68; ECF No. 38 ¶ 68.) However, Quick does dispute that he violated any policy of GEO or MVCC in so doing. GEO argues that these were sensitive documents that should have only been emailed using the secure server; Quick asserts that the GEO could not have considered them sensitive because they were stored on local hard drives in violation of GEO's own policy for storing sensitive documents. (ECF No. 39-1 at 134:4–136:1; ECF No. 38 ¶ 71; ECF No. 28 ¶ 71.) Quick further disputes the existence of any policy that stated that GEO's employees should use the secure system when communicating with the BOP.[25] (ECF No. 38 ¶ 71.)

The sensitive nature of the documents Quick sent, as well as the existence of any policy directing the use of the secured system for those documents are disputed material facts. If Quick can establish that GEO did not have such a policy and that the documents were not sensitive, a reasonable jury could conclude that GEO's proffered reasons of terminating Quick for communicating sensitive document through an unsecured server are pretextual. The Court must accordingly proceed to consider Quick's alleged failure to update MVCC's Emergency Plans.

---

[25] Quick testified in his deposition that he was aware of a policy for communicating sensitive information but asserts that there was no mention of a blanket policy regarding communications with the BOP. (*See* ECF No. 39-1 at 137:19–21.)

### ii. A Reasonable Jury Could Conclude that Quick Had No Obligation To Update MVCC's Emergency Plans by GEO's Stated Deadline

Quick concedes that MVCC staff attending ART on January 10, 2017, were unable to review MVCC's Emergency Plans as expected and that it was his responsibility to ensure that this occurred. (ECF No. 39-1 at 137:19–139:5.) Quick's testimony states that the plans are to be updated yearly to comply with BOP guidance, but GEO has not identified any specific date by which BOP required these annual updates. (*See id.* at 137:9–18.) Quick also testified that he had explained to Uhlig that MVCC staff would not be able to review the Emergency Plans on January 10, 2017, because he was waiting for Warden Kuta's approval of the updates he completed. (*Id.* at 138:13–139:5.)

A reasonable jury could disbelieve that GEO terminated Quick's employment because he failed to timely update MVCC's Emergency Plans. A reasonable jury could believe that Quick had complied with GEO's expectations to update the Emergency Plans and that responsibility for the inability of MVCC staff to review the Emergency Plans at the January 10 meeting lies with Warden Kuta for failing to timely approve the plans. Whether Warden Kuta was responsible for the delay in approval of the Emergency Plan is a disputed material fact.

Accordingly, because there remain disputed material facts regarding whether GEO's proffered reasons for terminating Quick's employment, GEO is not entitled to summary judgment on Quick's wrongful termination claims.

### iii. A Reasonable Jury Could Conclude that GEO Terminated Quick as a Result of His Perceived Disability

Quick primarily directs his arguments on the issue of pretext towards discrediting GEO's reasons for terminating him. (*See* ECF No. 37 at 30–36.) However, he briefly contends that the

totality of the circumstances surrounding his final year at MVCC show that Warden Kuta terminated him as a result of his perceived disability. (*Id.* at 36.)

The Court has extensively detailed above that a reasonable jury could conclude that GEO subjected Quick to harassment as a result of a perceived disability. *See supra* Section VI.A.1.b. A reasonable jury could also conclude that GEO terminated Quick as a result of his disability because there is sufficient evidence in the record to show that GEO conducted a concerted effort to discipline Quick to generate pretext to discharge him. There is no evidence in the record that Quick had any performance issues prior to his heart surgery. The record reflects that, prior to his heart surgery, he was performing at or above GEO's expectations, and his rapid rise through GEO's ranks supports this. (ECF No. 28 ¶¶ 2–6.) Further, Quick essentially served as GEO's full time Training Administrator for ten months before being officially promoted and received an award for his performance in that role, while also scoring high marks in his duties as a correctional officer. (ECF No. 39-1 at 61:13–18.) For over four and a half years at GEO—from hiring in September 2011 to return from medical leave in April 2016—Quick had a clean disciplinary record. Only after he returned from heart surgery, when a reasonable jury could conclude that Warden Kuta began viewing him as disabled, did this record change.

Quick testified that Warden Kuta placed restrictions upon his duties as "Dr. Kuta," as a result of Quick returning from heart surgery earlier than Warden Kuta believed appropriate. (ECF No. 38 ¶ 31.) Quick also testified that Warden Kuta imposed additional duties upon him after his return. (*Id.* ¶ 19.) Quick also suffered his first reprimand just days after returning to work. (ECF No. 28 ¶ 43.) Finally, there is record evidence of other complaints of employment

discrimination—related to age, race, and disability status—at MVCC during the relevant time period involving Quick's ultimate termination. (ECF No. 38 ¶¶ 79–82.)

In addition to evidence that supports an affirmative inference of discrimination, there is ample support for a jury to disbelieve GEO's proffered reasons for termination. The parties dispute whether the documents Quick sent to the BOP were sensitive and whether there was a policy that directed that any communications with the BOP occur through secured systems. (ECF No. 28 ¶ 71; ECF No. 38 ¶ 71.) The parties also dispute the circumstances related to Quick's alleged failure to timely update MVCC's emergency plans; Quick contends that he had completed his work and was simply waiting for Warden Kuta to sign off of and approve the documents. (ECF No. 28 ¶ 70; ECF No. 38 ¶ 70.)

From all this evidence, a reasonable jury could conclude that GEO terminated Quick as a result of his perceived disability.

**VII. Conclusion**

For the foregoing reasons, the Court denies GEO's Motion in its entirety.

A corresponding order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EUGENE QUICK,                        )        Case No. 3:18-cv-93
                                     )
                                     )
              Plaintiff,             )        JUDGE KIM R. GIBSON
                                     )
       v.                            )
                                     )
THE GEO GROUP, INC. and SHON         )
KUTA,                                )
                                     )
                                     )
              Defendants.            )

## ORDER

AND NOW, this _3rd_ day of February, 2020, upon consideration of GEO's Motion for

Summary Judgment (ECF No. 26), **IT IS HEREBY ORDERED** that the Motion is **DENIED.**


BY THE COURT:


_____
KIM R. GIBSON
UNITED STATES DISTRICT JUDGE